**EXHIBIT A**



**Office of General Counsel**
**Richard E. Casagrande**
*General Counsel*

**Albany**                                                    **New York**

**Robert T. Reilly**                              **Claude I. Hersh**
*Associate General Counsel*          *Assistant General Counsel*

**Michael S. Travinski**                   **Lena M. Ackerman**
*Associate General Counsel*           *Associate General Counsel*

**ATTORNEY-CLIENT COMMUNICATION/**
**PRIVILEGED AND CONFIDENTIAL**

May 23, 2017

**Via Email (redapplecb@msn.com),**
**USPS Express Mail and Regular Mail**

Ms. Carolyn Bivona
188 Rose Avenue
Staten Island, NY 10306

**Re:     Bivona, Carolyn advs. New York City Board of Education**
**Our File No. 261436-T240**

Dear Ms. Bivona:

Enclosed is a copy of the Opinion and Award issued by Hearing Officer Philip L. Maier, dated May 23, 2017 ("Award").   My office received the Award via email on May 23, 2017. Hearing Officer Maier has issued a decision dismissing all of the charges against you.

Since the Hearing Officer has dismissed all of the charges, there is nothing further which needs to be done regarding this matter.   I will soon be closing our file in the matter.   As such, please let me know, as soon as possible, whether you require copies of any other portions of the file.

I wish to congratulate you on the outcome of this case and wish you luck in your future endeavors.

If you have any questions or comments, please feel free to contact me at (212) 533-6300. Thank you for your attention in this matter.

Very truly yours,

RICHARD E. CASAGRANDE

By: _____
KEITH J. GROSS
Of Counsel

KJG/np
NYCLegal187222

52 Broadway, 9th Floor  ■  New York, N.Y. 10004  ■  (212) 533-6300
New York State United Teachers
Affiliated with • AFT • NEA • AFL-CIO



STATE OF NEW YORK
STATE EDUCATION DEPARTMENT
SCHOOL DISTRICT – EMPLOYER – EMPLOYEE RELATIONS

---

In the Matter of the Charges Preferred By:

                                      SED File No. 30,757

DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK

                               Hearing Officer's
                 Complainant,          Opinion and
                               Decision

       -against-

CAROLYN BIVONA,

                 Respondent – Tenured Teacher.

Pursuant to Education Law Section 2590(j)(7) and
Section3020-a

---

HOWARD FRIEDMAN, GENERAL COUNSEL (JESSICA KISHPAUGH and LISA
McFADDEN, of Counsel), for Department of Education of the City of New York

OFFICE OF RICHARD E. CASAGRANDRE, ESQ. (KEITH GROSS, Esq. of Counsel),
for Carolyn Bivona

### OPINION AND DECISION

      The Department of Education of the City of New York (Department) brought

charges against Carolyn Bivona (Respondent), a tenured teacher, pursuant to

Education Law sections 2590(j)(7) and 3020-a alleging that she engaged in misconduct,

verbal abuse, corporal punishment, neglect of duty, and conduct unbecoming her

profession and during the 2016-17 school year.

A pre-hearing conference was held on March 16, 2017. A hearing was held before me on March 20, April 7, 19, 20 and 26, 2017.[1]  The parties were represented by counsel throughout the proceeding and were afforded a full and fair opportunity to present witnesses, conduct direct and cross-examination, and present documentary evidence.  The parties presented closing arguments and submitted arbitration decisions in support of their positions on April 27, 2017.

## SPECIFICATIONS

CAROLYN BIVONA (hereinafter referred to as "Respondent"), under File #0700210, is a tenured teacher, assigned to The Gov. Thomas Dongan Elementary School, P.S. 11, District 31, located in Staten Island, New York.  During the 2016–2017 school year, Respondent engaged in misconduct, verbal abuse, corporal punishment,[2] neglect of duty, and conduct unbecoming her profession.

### In Particular:

**SPECIFICATION 1:** On or about September 19, 2016, in her classroom during instructional time, Respondent:

a) Failed to appropriately respond to Student T.B.* while he was crying and/or in distress.
b) Failed to comfort and/or engage with Student TB while he was crying.
c) Failed to allow the paraprofessionals assigned to her classroom to assist Student T.B. when he was crying and/or in distress.

**SPECIFICATION 2:** On or about September 19, 2016, in her classroom during instructional time while Student T.B. was crying and in distress, Respondent stated to paraprofessional(s) in her classroom who were attempting to assist Student T.B., in sum and substance:

a)      There is a method to my madness.
b)      You have to break the horse's back so this won't happen again.

---

[1] The number references for the transcript correspond to the day of hearing.

[2] Chancellor Regulation A-420 defines corporal punishment as "any act of physical force upon a student for the purpose of punishing the student." DOE Exhibit 9.

**SPECIFICATION 3:** By committing one, some, or all of the acts described in Specification 1 and 2, Respondent:

a) Caused Student T.B. to cry and/or to continue to cry.
b) Caused Student T.B. to have difficulty breathing.
c) Acted in a manner that placed Student T.B. at risk of harm and/or physical injury.
d) Acted in a manner that had or would have had the effect of unreasonably and/or substantially interfering with a student's mental, emotional, or physical well-being.
e) Acted in a manner which reasonably caused or would have been reasonably expected to cause mental, emotional, or physical harm to a student.
f) Knowingly acted in a manner likely to be injurious to the physical, mental, or moral welfare of a child or children less than seventeen-years-old.

**SPECIFICATION 4:** On or about September 22, 2016, in the presence of students and/or staff, Respondent:

a) Pointed her finger at paraprofessional Brittany LaRosa's face.
b) Stated in sum and substance to Brittany LaRosa: How dare you go to administration.
c) Stated in sum and substance to Brittany LaRosa: You are being petty.
d) Stated in sum and substance to Brittany LaRosa: You have a negative attitude.
e) Stated in sum and substance to Brittany LaRosa: You are not a team player.

**SPECIFICATION 5:** By committing one, some or all of the actions described in Specifications 1 through 4 above, Respondent's actions had a disruptive and/or negative impact on her workplace.

**SPECIFICATION 6:** By committing one, some or all of the actions described in Specifications 1 through 4 above, Respondent's actions interrupted instructional time for her students.

### The Foregoing Constitutes:

- Just cause for disciplinary action pursuant to Education Law § 3020-a;
- Corporal punishment;
- Verbal abuse;
- Conduct unbecoming Respondent's position, or conduct prejudicial to the good order, efficiency, or discipline of the service;
- Substantial cause rendering Respondent unfit to perform properly her obligations to the service;
- A violation of the By-laws, Rules and Regulations of the Chancellor, School and/or District;

3

- Neglect of duty; and
- Just cause for termination

## FACTS

Bivona has been a teacher for the Department for the past 23 years and assigned to PS 11 for the past 21 years. During this period she has taught special education classes K- 5th grade and was utilized by the current principal, Erica Mattera, as a dean for a period of time. There are 25 teachers and about the same number of paraprofessionals in the school. Her tenure areas are in special education K-12 and ESL. She has a Masters plus 30 credits in special education and also has taken a course in applied behavioral analysis. This is the first occasion she has been brought up on EL §3020-a charges.

John Ferrannini has been employed by the DOE since 2000, an assistant principal since 2011, and assigned to PS 11 since 2014. The incidents in question occurred in September 2016. Ferrannini received a letter from Brittany LaRosa, a paraprofessional, on September 26 which mentioned the incident with Student A which is the subject of Specification 1, a conversation between Bivona and a Student B's mother, and the incident with Bivona and LaRosa, which is the subject of Specification 3 and referred the matter to the Special Commissioner of Investigation (SCI).[3] According to the SCI complaint form on September 26, 2016 the office received a phone call from Ferrannini stating that he received a statement from LaRosa in his mailbox making allegations the above against Bivona.[4] The matter was referred back to the school for

---

[3] 3T, pp.225-26.

[4] Respondent's Exhibit 1.

4

an investigation which he conducted in November. He interviewed the five

paraprofessionals in Bivona's class and had a disciplinary interview with her. The facts

as developed during this hearing are set forth below.[5]

In the 2016-17 school year Bivona was assigned a class with seven students and

five paraprofessionals. The five paraprofessionals were Waffa Ebeid, Alex Gallo, Susan

Boshra, Angela Sanfilippo and LaRosa. In addressing a student who exhibits a problem,

she testified that she would first have the paraprofessionals try to calm the student

down but would handle any dangerous situations herself. She refers to the

paraprofessionals as teachers and assigns them tasks but first asks what they enjoy, is

receptive to their input and tries to work as a team. She advised them in the beginning

of the 2016-17 school year that she would stand up for them and said she was not

concerned about them speaking with the administration.  She testified that Student A

told her to have the paraprofessionals leave him alone and relayed that comment to

them in his presence.[6]

Bivona testified Student A had been in her class in kindergarten, first, and

second grade. He would cry on occasion and that testified that he had some sensory

needs. He was a nice student, who liked to play and does not fight but she would have

to keep him on task. He used to cry and if given attention would cry for a longer period

of time. His Individualized Education Program (IEP) states that he need positive

reinforcement. She testified that she uses the strategies in PRIM, a handbook available

to staff, which is the acronym for the Pre-Referral Intervention Manual. This provides

---

[5] DOE Exhibit 1.

[6] 4T, pp. 359-63.

different behavioral management strategies and is applicable to both special and general education students. Bivona pointed out that the document states "Ignore student temper tantrums. Do not let the student have his/her way when crying." It also states "Make certain that you do not give into student temper tantrums because others are present. Maintain consistency at all times." This strategy is to be used prior to seeking any other intervention.[7] Ferrannini testified that he is not familiar with PRIM but that is a superseded by a child's IEP. If Student A was hyperventilating, however, it would have been a crisis and the IEP would not be applicable. If he was crying for as long as LaRosa and Sanfilippo told him the incident would still be inappropriate and disruptive.[8]

Chancellor Regulation A-411 is the Department's policy concerning intervention and de-escalation for students experiencing behavioral crises. It sets forth the procedure for de-escalation and intervention, contacting 911, the school's responsibility when 911 is contacted, and requires crisis intervention plans, reporting procedures and notification to staff of the plans and that records of such be maintained.[9]

**SEPTEMBER 19 INCIDENT**

LaRosa has been working at PS 11 as a paraprofessional for over one year with autistic children. They are 8 to 9 years old and she has worked with some of the same children over the past two years. She testified that she has received some training crisis de-escalation and autistic spectrum disorder, has a high school degree and attended

---

[7] Respondent's Exhibit 4, 4T, pp. 367-68.

[8] 3T, pp. 290, 306, 319-20

[9] DOE Exhibit 8.

one semester of college. She has also received training in how to interact with special needs children and those who have sensory issues.[10]

In the 2016-17 school year she was assigned to Bivona's classroom and was assigned to one student, Student B. On September 19 Student A was upset, as LaRosa testified, because of a hole in his shoe. She, Ebeid and Sanfilippo tried to tell him they could not fix it and he became very upset. He was banging on the desk and crying. Bivona moved him to another desk and put up a board so he could focus on his work. He did not calm down, however, and started crying and hyperventilating. She tried to intervene and give him a glass of water since that had been effective previously in assisting him. Ebeid and Sanfilippo also went over to him but Bivona told them, however, to leave him alone and for him to "shh." Bivona told him not to cry and he would have to redo his paper if he got tears on it. This occurred during the 7th period and continued for over 45 minutes and into the next period.[11]

LaRosa testified that the proper procedure would be to deescalate the situation but Bivona told her to leave Student A alone. She and the other paraprofessionals complied with this direction. She testified that she could get in trouble if she did not do as directed. Student A became more upset because he was alone, was sobbing, having a hard time breathing, was shaking and in distress. She thought his health was at risk and that the other children were distracted as a result of this incident.[12] She provided a statement dated November 9, 2016 in which she stated that the student was crying and

---

[10] 3T, pp. 138-40.

[11] 3T, pp 145-47; 152.

[12] 3T, p. 153.

7

Bivona asked her and Sanfilippo to back away from him. He began crying harder and gasped for air. She wrote that Bivona said "shh" and they will come in and told him that he would have to write a new one if tears got on his paper.[13]

She testified that same day she told the Ferrannini about the incident who gave her a form to provide a statement. She took the form home with her and included a reference to the incident in a statement dated September 22 which she submitted on September 26.[14] LaRosa testified that Bivona went to Student A but did not use any tactics to calm him down.[15]

Sanfilippo has been employed as a paraprofessional by the Department for the past 5 years and works full time at PS 11.[16] She testified that she has a high school degree and 30 college credits, received training in autistic spectrum disorder for one day and therapeutic crisis intervention. She testified that she is not familiar with PRIM.[17] She has known Bivona for the past five years and began working with her at the start of the 2016-17 school year. She testified that she had a fairly friendly relationship with Bivona, though she thought that she belittled her sometimes. The relationship became tenser after the incident which occurred on September 19.

Sanfilippo testified that Student A was a 9 year old autistic child who has sensory needs.[18] He was very quiet, likes attention, is well behaved and did not exhibit any

---

[13] DOE Exhibit 1, p. 22.

[14] 3T, t53.

[15] 3T, pp. 191-02, 94

[16] 2T, p. 25.

[17] 2T, pp. 80, 98

[18] 2T, p. 31-3.

behavioral problems. LaRosa also testified that he had sensory issues but no behavioral problems.[19] On September 19 he was having a problem with his new shoes since one had a thread showing. It distracted him and he was unable to work and started to cry. Sanfilippo testified that Bivona told him to sit at another table that was behind a privacy board so he could not see the other students and they could not see him. He started crying more and became hysterical and was red in the face. Sanfilippo went over to try to calm him and Bivona told her to leave him alone. Sanfilippo testified that the student was short of breath, in distress, but that Bivona did not go over to the student and told her to leave the student alone.  Ebeid went over to him, as well as LaRosa, and Bivona told them both to leave him alone. LaRosa tried to offer him a glass of water. Bivona told Student A to leave the teachers alone and to get busy or he would not get a cookie or be the last one to get one. He responded by continuing to cry hysterically and began to hyperventilate. She testified that due to the fact that he was hyperventilating she thought the situation posed a safety concern and that pursuant to her training she should try to calm him down. Sanfilippo testified that according to the training she received she was to try to calm him down and to call a crisis counselor if not successful. Bivona did not call anyone to assist with this situation.

Student A, according to Sanfilippo, cried for about one hour which included 6th period to the end of the school day. She followed Bivona's instructions since she felt intimidated and feared that she would retaliate. The class was disrupted by this event but she did not report this incident on the day it happened or the day after.[20]

---

[19] 3T, 143-45.

[20] 2T, pp. 35-53, pp. 38, 46, 88.

Sanfilippo also testified that Bivona told her that "there was a method to her madness to get work done and that "she was going to break the horse's back" so that this would not happen again. She said this while the incident was occurring in front of the students and paraprofessionals.[21] Sanfilippo also testified that this conversation took place the next day. She said "OK" since she did not want to agree or disagree. This occurred with LaRosa present around dismissal time.[22] She also testified that Bivona scolded her and told her that she is in charge in the classroom and is not supposed to go to administration.

Sanfilippo testified that she maintained a log of events at the school and took notes on this event. She testified that she did so because she felt Bivona was a threat and also testified that she did not trust anyone in the school because of past experiences. The notes are consistent with her testimony and state that Bivona said that there was a method to her madness. They state that she yelled at Student A to do his work and that since he was the last to finish he should hurry so he would get a cookie. Since she did not want to agree or disagree, Sanfilippo responded by simply stating "OK." The next day she wrote that Bivona told her that "you have to break the horses back" so he would learn his lesson. She testified that Bivona told her that she is the boss in the classroom and she is not supposed to go to administration. She took notes of what occurred in the class and could use them against Bivona in the event she

---

[21] 2T, pp. 40-41; 51, 108-09.

[22] 2T, p. 52.

wanted to go after her about something and because she is a threat. She did not however write down certain things LaRosa stated.[23]

Bivona testified that on September 19 Student A began crying and cried for approximately 20 minutes. She testified in detail about what occurred in class during this time period and that he began crying about 20 minutes into the lesson. He was not hyperventilating, and she did not believe that he was experiencing any medical issues that required her to intervene. The paraprofessionals went over to the student but did not succeed in stopping him from crying. She addressed the conduct by moving him to a different desk since another student who was sitting next to Student A began to get annoyed and she took Student A to another table to decrease the interaction between those two students.  She put up a privacy board thinking that it might work to calm him down and was not trying to punish him. She also announced to the class that everyone would get a cookie once the assignment was completed. Her purpose was not to punish the student and when he finished he did get a cookie. She did not want the paraprofessionals to go over to the student again when he was sitting at the other table. LaRosa and Sanfilippo, however went over to the student which had a negative impact on the strategy she was trying to utilize. She did not want him to be able to get attention through his crying and in her opinion the crying was prolonged due to the paraprofessionals going over to him again.  She testified that he stopped crying by the end of the period and had told him do not cry loudly and not to bring attention to himself but does not recall mentioning anything about people coming into the room. At the end

---

[23] 2T, pp. 117, 119, 123.

11

of the next period, which was the end of the school day, Student A got on the bus and went home.[24]

Bivona testified that she made the method to her madness comment to Sanfilippo and LaRosa to explain what she was doing when she asked them to step back from Student A. She also stated that she said at dismissal time that sometimes you have to break the horse's back. She explained that she did not mean these statements literally.[25]

Ebeid, who has been a paraprofessional with the Department since 2010, was called as a witness on Bivona's behalf. She has been a paraprofessional in Bivona's classroom for a combined period of two years and had obtained a degree in accounting prior to immigrating to this country.[26] She testified that she has a good relationship with Bivona and that she has always treated the paraprofessionals in her class in a professional manner. She testified concerning the incident regarding Student A. She has known the student for a number of years and testified that he is a cute child, but has sensory problems and needs to be encouraged to do his work. It is common for him to cry in class at times such as when he did not want to do his work or when it is time to go home at the end of the school day. She testified that he likes attention and will find reasons to avoid doing his work.[27]

Ebeid testified that on September 19, Student A cried for about a total of 15 to 20 minutes due to an issue having to do with his shoe. Sanfilippo, LaRosa and she tried to

---

[24] 4T. 392, 395, 399-401, 408.

[25] 5T, p. 472, 475.

[26] 5T, pp. 419-20.

[27] 5T, p. 424-26; 430-31.

12

get him to do his work but were unsuccessful. Bivona told them to step back and to leave him alone. Bivona decided to move Student A to another table because the student next to him was becoming annoyed. He continued crying but Ebeid testified that this was not uncommon and it was a normal type of crying for him. Bivona went to him to try to encourage him to do his work and Ebeid testified that in her opinion Bivona was not required to take further action. Sanfilippo and LaRosa went to Student A and one of them offered him a glass of water even though Bivona had already told them to stay away from him. During her testimony she made no mention that he was hyperventilating or that his condition posed any type of safety problem.

She testified that she met with Ferrannini concerning this incident and wrote a statement dated November 4, 2016. According to the statement, Ebeid did not remember Bivona saying anything to Student B's mother about changing paraprofessionals. She further wrote that she did not hear Bivona yell at LaRosa and that on one occasion Student A was crying and Bivona told them to step back. LaRosa and Sanfilippo, however, went over to him again. She had been questioned by Ferrannini about the incident prior to writing the statement and told him, and testified, that the crying lasted about 15 to 20 minutes and not an hour and one-half. She told him LaRosa was lying and he was not crying for one hour and one-half. The length of time he was crying was not mentioned in her statement.[28]

Ebeid testified that during September 2016 LaRosa had exhibited a nasty and disrespectful attitude toward Bivona and the other paraprofessionals. At times she would leave the room without complying with Bivona's directive to inform her prior to

---

[28] 4T, p. 426-35.

13

doing so. At times when she was out of the room, LaRosa was talking to another teacher when she should have been in Bivona's classroom. Her attitude in November seemed to change, however, and her relationship improved with Bivona.

Ebeid testified that she does not speak with either Sanfilippo or LaRosa, however, since they both lied about her to the administration. The principal and assistant principal had told her not to mention that she had spoken to them about the incident which was the subject of the statement she had given. When she returned to the classroom, Bivona asked her if she was alright, and Ebeid said that she was and did not mention having given a statement. Sanfilippo and LaRosa both falsely advised the administrators that she had mentioned giving a statement. Sanfilippo, however, testified that Ebeid stopped talking to her after she was questioned by Ferrannini about this incident.

**SEPTEMBER 21**

LaRosa testified that she went to the assistant principal as a result of a conversation she overheard on September 21 between Bivona and the mother of Student B, the student she was assigned to in 2016-17. She said that she heard Bivona tell her that she wished that LaRosa had not been assigned to Student B and did not want her to be his paraprofessional. Ferrannini testified that LaRosa told him on September 21 what she had overheard and that she was upset at the time. She did not wish to continue the conversation and left his office. She returned, however, the next day and told him that Bivona yelled at her and that she did not want to be in the classroom anymore and that Bivona did not want her in the classroom.

14

Ferrannini testified that after the conversation with LaRosa in which she told him about Bivona's conversation with the mother, he spoke with Bivona and the principal informally. He testified that he did not view this as a disciplinary matter but one he wanted to address. They spoke with Bivona about that LaRosa told them Bivona was not really allowing her to do her job. Bivona did not really think that there was a problem. LaRosa gave him a statement concerning the incident on September 26.  He was not aware of the allegation concerning Student A until September 26.

**SEPTEMBER 22 INCIDENT**

LaRosa testified that on September 22 Bivona confronted her about going to the administration. LaRosa testified that Bivona was angry and asked her why did she go to the administration, and put her finger in her face during the conversation. She remembered telling Bivona that she heard what was said to Student B's mother and she denied having said that. In her statement she wrote that Bivona told her she was petty, had a negative attitude, was not a team player, and said how dare she go to the administration. She also wrote about the incident which precipitated this event, namely the overhearing of the conversation between Bivona and Student B's mother.[29] The statement also refers to the incident with Student A on September 19 and that Bivona never asked what the students need or want.

She also testified that she had a conversation with Bivona about a tote bag and stated that she had refused to use one. LaRosa testified that she wanted to use the one she had been using since it was a weighted bag and prescribed by his IEP. Bivona told

---

[29] 3T, pp. 154-60, 184; DOE Exhibit 1, pp. 21, 22.

her she was being petty, was not a team player, put her finger in her face and then LaRosa left the room.[30]

Sanfilippo also testified that on September 22 Bivona was yelling at LaRosa that she had to use a bag, that she was being petty and was not a team player. The bag was used to carry material for a student in the class and LaRosa refused to use it and left the room. Bivona was pointing her finger at LaRosa and then told her to "hush" when she realized other people heard them.[31]  Sanfilippo said she did not see Bivona put her finger in LaRosa's face.[32] While they were arguing Bivona's voice was raised while, according to Sanfilippo's testimony, LaRosa responded in a normal tone. LaRosa left the room during the argument.

Bivona testified that, after speaking with the administrators, she told LaRosa she never told Student B's mother that LaRosa should not be her son's paraprofessional and wished she had spoken to her first. She wanted to clarify this with her since they would be together for the rest of the year and did not want her to think badly of her. She told LaRosa that she was delusional and that when they speak to the mother they will know that she is a liar.  The interaction lasted a couple of minutes and the class was not disruptive. This happened before the tote bag incident.[33]

Ebeid also testified that on September 22 Bivona told LaRosa to use a tote bag to carry Student B's belongings. The student had a number of necessary items, such as

---

[30] 186-89

[31] 2T, pp. 57-62.

[32] 5T, p. 233.

[33] 5T, pp. 480, 482.

a board and sanitizer, that were needed to accompany when he left the class and would become hysterical and unruly if an item was not available. LaRosa, however, had on a number of occasions needed to return to the class to get one of the items which she had forgotten leading the child to become upset and disruptive. Bivona asked her to carry everything in one bag which she provided to her and LaRosa refused to do so and left the class. Ebeid was asked about the comments attributed to Bivona during this interaction with LaRosa and testified that she did not hear any of those comments having been made. She also testified, however that she was on the other side of the room and attending to the child she was assigned.[34]

Ferrannini also took statements from the other two paraprofessionals assigned to Bivona's class during his investigation. Gallo wrote that he said he had no knowledge of Bivona saying anything about LaRosa being unfit as a paraprofessional for Student B. He wrote that he remembered Student A crying for over an hour and one-half that he was hyperventilating and distraught. Bivona said to just leave him alone. He also wrote that he remembered Bivona coming back into the classroom and pointing in LaRosa's face, saying she was not a team player and was being petty. The statement is dated November 4, 2016.  Boshra provided a statement in which she stated that she did not hear Bivona say anything about LaRosa and did not see Student A cry for about 45 minutes. This statement is dated November 7, 2016.[35]

After the investigation was completed Ferrannini and Mattera conducted a disciplinary interview with Bivona on November 16 at which Bivona chose not to have a

---

[34] 5T, pp. 435-44.

[35] DOE Exhibit I pp. 28, 29.

union representative present. During the meeting, Ferrannini reviewed the allegations with Bivona. She responded stating that LaRosa is a proven liar and did not make any comment to Student B's mother. She said "shh" to LaRosa when she became argumentative about not wanting to use the tote bag. She stated that Student A cried at most 20 minutes and did tell them not to go near the student. If they had listened to her and not intervened he would have cried for 10 minutes. She admitted stating there is a method to my madness but not about breaking a horse's back. She did admit saying this though during the course of the hearing. She never said anything to LaRosa about going to the administration and was not close to her.

Ferrannini concluded that Bivona left Student A to cry for over an hour and that he was hyperventilating and in distress. She also yelled at LaRosa and pointed a finger in her face resulting in her feeling "embarrassed and humiliated." Bivona submitted a rebuttal dated January 4, 2017. She wrote that the Student was never in distress and was not hyperventilating She referred to the sections in PRIM in which it is stated that a teacher should ignore a temper tantrum and by doing so discourage such behavior. Ferrannini testified that Bivona should have deescalated the situation with Student A and that the hyperventilating caused a health risk. [36]

## POSITIONS OF THE PARTIES

### DEPARTMENT

The Department asserts that the case addresses a teacher who mistreated an autistic child and that the Respondent violated the trust of caring for the children in her classroom. The use by the Respondent of the phrase "breaking a horse's back" is

---

[36] Respondent's Exhibit 4. 3T, p. 253.

reflective of her attitude of punishment towards students. The student's IEP states that he needs positive reinforcement which was obviously not implemented at this time. By not taking action a precluding the paraprofessionals from doing so, the Respondent was in violation of Chancellor's Regulation A-411, the IEP and other school policies to deescalate crises situations. The student was crying for a long period of time, was red in the face and was having breathing problems. The paraprofessionals tried to assist the child and the testimony fairly evaluated shows that this could not have taken place in only 20 minutes. The fact that there may be some inconsistencies between the statements and testimony is to be expected and does not undermine the credibility of the witnesses. Sanfilippo's notes, however, refer to the incident and bolster her credibility. They did not know each other at the beginning of the year and there is no basis to find that they conspired against Bivona.

The Respondent's attitude is also demonstrated by the "method to my madness" statement and comments such as don't get tears on the paper. These comments are basis for a finding that Bivona, while the student was crying and in distress, violated Specification 2.  This evidence together with Bivona's actions and lack of action taken concerning Student A allowed the situation to continue and form a basis for finding that she committed the actions alleged in Specification 3.

The Department also submits that the actions alleged in Specification 4 constitute misconduct. It is improper to confront a staff manner in an aggressive manner. The testimony from LaRosa and Sanfilippo is consistent and supported by Gallo's stated.  Ebeid was not a credible witness and it is more likely that she stopped speaking with the other paraprofessionals because of the complaint that was filed that

19

about which she testified. The Department relies upon a number of decisions NYC

DOE –and- P.D. SED #4517, NYC DOE –and- J.M. (H.O. Berg, 2013 SED #19,577),

NYC DOE –and- J.G. (H.O. Javitz, 201 SED #20,483) in support of its position that the

Respondent engaged in corporal punishment and that her actions negatively affected

the safety and security of the student.

**RESPONDENT**

The Respondent argues that the evidence does not support the allegations in this

matter. With regard to the September 19 incident, the testimony from both Bivona and

Ebeid demonstrates that Bivona responded to Student A while he was crying and based

on her experience with this specific student acted in an appropriate manner. She utilized

strategies to address the situation which were appropriate. The paraprofessionals,

however, despite being told to leave the student alone went over to him again and in

effect undermined the strategy thereby prolonging the situation. Additionally, Bivona's

comments to the effect that there is method to her madness and you have to break the

horses' back were figurative and the evidence is not clear as to when the comments

were made.

Further, with regard to Specification 3, there is evidence which indicates that

Student A cried lasted for only 15 to 20 minutes based upon Bivona and Ebeid's

testimony and the statement from Boshra supports this position. She did not cause

Student A to have difficulty breathing, and while the student was crying, this was

nothing out of the normal for him and or unusual in and of itself. Both Bivona and Ebeid

had prior experience with the student and Bivona implemented the strategy set forth in

PRIM.

The Respondent further asserts that LaRosa and Sanfilippo were not credible. For example, LaRosa's comments that Bivona said to Student B's mother that she should not be assigned to that student could not be corroborated and Sanfilippo testified that she did not trust anyone in the school.

The evidence also does not support the allegations set forth in Specification 4. Sanfilippo testified about the argument concerning the tote bag, while LaRosa testified that Bivona had this interaction with her as a result of Bivona becoming angry due to her going to the administration. Bivona was very specific in her testimony and careful in the words she used while having this interaction with LaRosa. The comments attributed to Bivona are contrary to how she treats the paraprofessionals as testified to by Ebeid. Even if these statements were made, they would not constitute misconduct, verbal abuse, corporal punishment, neglect of duty, and conduct unbecoming her profession as alleged.

In the event any penalty is imposed, the Respondent relies upon NYC DOE – and – C.F. (H.O. Murphy, SED #25,877) in which a fine was imposed upon a teacher for cursing and calling a co-worker a racist. The hearing officer concluded that this was unprofessional behavior, but did not warrant the termination of an employee with 16 years of service.

## DISCUSSION

For the reasons set forth below, I do not find that the Department has proven by a preponderance of the evidence the allegations and dismiss the Specifications in their entirety.[37]

---

[37] *Martin v. Ambach*, 67 NY2d 975 (1986).

The Department in effect alleges that the factual basis for sustaining Specification 1 is that Student A was crying for a prolonged period of time without Bivona rendering assistance and also that she failed to render assistance while he was hyperventilating creating a safety hazard. Both Sanfilippo and LaRosa testified that, with regard to Specification 1, Student A was hyperventilating which posed a safety hazard, was crying for over an hour, and became hysterical. Neither, however, had any medical training or testified that they had experience in identifying an individual who was hyperventilating. I do not find that the evidence demonstrates that the child was hyperventilating or in unsafe medical situation. Bivona testified that at no time was the student hyperventilating and that if he was she would have intervened and contacted the appropriate party outside the classroom. Ebeid also testified that the student was crying but that this was not out of the ordinary for him and that he was never in any danger and made no mention of him hyperventilating. I find their testimony more credible than that presented by Sanfilippo and LaRosa. They were more experienced and had a history of interaction with this student. Based upon my observation of them while testifying and an evaluation of their testimony, I credit their testimony and conclude that they would not allow a safety hazard to be posed to this student. In this regard, I find Ebeid's testimony persuasive. I find that she is a mature paraprofessional who listened to Bivona's instructions, had a history with and apparent fondness for the child, and was aware of her responsibilities in the classroom. I do not believe that she would be present and allow a student to be in danger, especially one that she has known and with whom she has prior involvement. I am not therefore not persuaded that Student A was crying in the manner portrayed by Sanfilippo and LaRosa.

I also find it significant that Bivona had known the student for a number of years and that she especially had more experience and training than Sanfilippo and LaRosa in dealing with special education students. Student A had been in Bivona's class for 3 years. Again, based upon my observation of her while testifying and an evaluation of her testimony I do not find it credible that she, and Ebeid, would permit the student to cry to the extent that he was hyperventilating and pose a safety hazard to himself.

Additionally, Student A when he began to cry disturbed one of the students next to him prompting Bivona to move him to another table. If he were crying thereafter to the extent as described by Sanfilippo and LaRosa I would have expected that the other students in the class would be disturbed to an even greater degree. The record, however, does not indicate any other specific student reaction to what was described as a student in great distress. Additionally, Boshra, who would have been in the class the next period, in her statement wrote in effect that she did not observe anything unusual regarding the student.

I also find that the sequence of events undermines the persuasiveness of the Department's evidence. While LaRosa told Ferrannini about this incident on September 19, she did not submit a statement until two days later. In her statement submitted on September 22 she seems more concerned about what she believed Bivona said to Student B's mother about not wanting her as a paraprofessional. Sanfilippo did not mention anything to Ferrannini that day or the day after but submitted a statement dated November 3. Her notes referring to the incident may have been a result of her feeling for some unspecified reason that Bivona was a threat to her. Further, Ferrannini did not take any action until he received LaRosa's written statement on September 26 and did

23

not investigate this matter until November and Bivona remained in the classroom until February 2017. This sequence of events and lack of immediate attention to what was described as a safety threat to a student's health undercuts the credibility of the Department's case.

The Department points to Gallo's written statement in support of its position. It was taken, however, nearly one and one-half months after the event and he was not subject to cross-examination. Boshra's statement, in contrast, makes no mention of the event. I therefore do not find reliance upon Gallo's remarks persuasive.

Bivona testified that she followed the protocol set forth in PRIM which in effect states that a teacher should ignore student temper tantrums and not to allow them to influence the behavior of other student. I find that she followed this protocol which was appropriate since the student was not in danger. I also find that she went over to the student and engaged with him both when he started crying and after he was moved to the table. The alleged refusal to allow the paraprofessionals to intervene was based upon her intent to follow the protocol set forth in PRIM. I note in this regard that Ebeid followed her instructions in this regard while Sanfilippo and LaRosa refused and returned to the student.

I also find that the Department has not demonstrated by a preponderance of the evidence that Student A was crying for more than one hour and find, in accordance with Bivona and Ebeid's testimony, that the student was crying for 15 to 20 minutes. During this period Bivona attended to the student by moving him to another table, addressing his needs consistent with PRIM, and offering and ultimately giving him a cookie. In light of the description of the incident by Bivona and Ebeid, I do not find that the Department

has met its burden of proof. For these reasons, I also do not find that the evidence establishes that Bivona caused any distress to Student A, that she acted in an unreasonable manner which interfered with or caused his mental, emotional, or physical well-being, or that she knowingly did so. Specification 3 is therefore also without factual support in the record and is hereby dismissed.

I do not find that the comments in Specification 2 that Bivona made regarding a "method to her madness" and to "breaking the horse's back" constitute verbal abuse, corporal punishment, neglect of duty, or conduct unbecoming her profession. These comments, as Bivona stated, are clearly figurative. There is no evidence that any student heard or reacted to these comments and it is not clearly established if these comments were made that day or the next. In any event, I do not find that they indicate an attitude on her part to not take the matter seriously or an indifference to the children in her class. Accordingly, this Specification is dismissed.

I also do not find that the record establishes the allegations in Specification 4 and agree with the Respondent's argument that these statements even if made do not constitute misconduct, verbal abuse, corporal punishment, neglect of duty, or conduct unbecoming her profession. Not every unpleasant exchange between staff members gives rise to just cause for discipline. Telling a staff member that he or she is petty, negative, not a team player and complaining about having spoken to administration does not under the circumstances presented arise to a disciplinary infraction. At the outset, I note that there is a conflict in the Department's evidence about whether these comments were made in the context of a dispute between Bivona and LaRosa concerning LaRosa's refusal to use the tote bag, or whether as testified to by LaRosa,

25

the dispute related to comments Bivona allegedly made in response to her having

complained about Bivona to administrators. Ebeid in this regard testified that she did not

hear any of the comments made and that the exchange between Bivona and LaRosa

related to the tote bag. Bivona testified that she did tell LaRosa she was delusional

since she never mentioned anything to Student B's mother. I do not find that any

student was impacted by this exchange, that it disrupted the class in performing their

work, impeded the Department's mission in providing educational services to students

or was sufficiently egregious conduct meriting disciplinary action. I also do not find that,

as testified to by Sanfilippo, that Bivona was yelling. The alleged exchange, even if

proven, was a minor verbal dispute between staff members which had no negative

impact upon any students. Accordingly, I dismiss Specification 4.

## DECISION

For the reasons set forth above, I dismiss the Specifications in their entirety.

Dated: May 23 , 2017

Philip L. Maier
Hearing Officer

26

**AFFIRMATION**

**STATE OF NEW YORK}**
**COUNTY OF NEW YORK}**

I, Philip L. Maier, do hereby affirm upon my oath as Hearing Officer that I am the individual described herein who executed this foregoing instrument, which is my Opinion and Decision.

Dated: May 23, 2017

Philip L. Maier
Hearing Officer

27